```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- x
J. J. CRANSTON CONSTRUCTION CORP.           :
                                            :
                        Appellant,          :
                                            :          MEMORANDUM & ORDER
            -against-                       :
                                            :          1:24-cv-05617 (ENV)
CITY OF NEW YORK,                           :
                                            :
                        Appellee.           :
---------------------------------------------------------- x
```

VITALIANO, D.J.

Debtor-Appellant J.J. Cranston Construction Corporation ("Cranston") appealed the Order of the United States Bankruptcy Court for the Eastern District of New York denying its application to reopen its thirty-three-year-old bankruptcy case. The application was opposed by the City of New York, creditor and appellee, ("the City"). For the reasons that follow, the Order of the Bankruptcy Court is affirmed.

## Background[1]

At the heart of this bankruptcy case is a commercial building located in Manhattan at 1650 Madison Avenue (the "Property"). Title to the Property has ping-ponged between Cranston and the City. In 1991, owing to Cranston's record failure to pay municipal real property taxes on the Property, the City initiated an *in rem* proceeding to foreclose on the property and notice its sale at public auction. *In Rem Tax Foreclosure Action No. 37*, Index No. 97001/1991 (Sup. Ct. N.Y.

---

[1] The relevant facts are drawn from the record transmitted to the Court. *See* Dkt. 3 and 4 (together, the "record"). Citations to the Bankruptcy Court record are denoted using the abbreviation "R." Citations to the parties' briefing on appeal are with reference to the Electronic Case Filing ("ECF") pagination. Finally, citations with "Bk.-Dkt." reference the Bankruptcy Court's docket, while citations with "Dkt." reference this Court's docket.

1

Cnty. Feb. 2, 1993) (the "Foreclosure Action"), R. at 58; Bankruptcy Court Order Denying Reopening ("Order"), R. at 1380; Parties' Stipulation of Fact ("Stip.") ¶ 17, R. at 469. Spurred by the City's filing of the *in rem* proceeding, Cranston filed for Chapter 11 bankruptcy protection on October 24, 1991, which triggered the automatic stay provisions of the Bankruptcy Code designed to preserve the Bankruptcy Court's jurisdiction over the debtor's estate. 11 U.S.C. § 362; Order, R. at 1380; Stip. ¶ 20, R. at 470. Thereafter, little progress was made toward implementing a Chapter 11 plan of reorganization. Order, R. at 1380. As a result, the U.S. Trustee moved to convert or dismiss the bankruptcy proceeding, which was adjourned at various points. Order, R. at 1380–81. Ultimately, the Bankruptcy Court granted the U.S. Trustee's motion and, on April 29, 1993, converted the bankruptcy to a Chapter 7 case. Order R. at 1381; Stip. ¶ 9, R. at 468. On May 9, 1994, the Chapter 7 Trustee filed a no asset report, and the case was closed on July 14, 1994. Order, R. at 1381; Stip. ¶ 39, R. at 471; R. at 1. Years later, the underlying records were transferred to the National Archives and destroyed in 2013. Order, R. at 1381; Stip. ¶ 40, R. at 471.

On February 3, 1993—while the bankruptcy was pending and the automatic stay was in effect—the City took *in rem* title to the Property. Judgment of Foreclosure, R. at 58–69; Order, R. at 1381; Stip. ¶ 29, R. at 470. At no time prior to the entry of the *in rem* judgment of foreclosure did the City seek relief from the automatic stay. Order, R. at 1381. Nearly seven months after the bankruptcy case was closed, Seymour Schorr—Cranston's president and one of its three shareholders, along with his brothers Harold and Theodore (together, the "Schorr Brothers")—asked the City to release the Property's *in rem* title in a notarized application dated January 12, 1995. Seymour Schorr Application, R. at 309–312; Order, R. at 1381; Stip. ¶ 13, 41, R. at 469, 472. In his application, Seymour Schorr acknowledged that the Property was acquired by the City

via an *in rem* foreclosure action on February 3, 1993, and that Cranston's bankruptcy had closed in July 1994. Seymour Schorr Application, R. at 310. Because taxes on the Property remained unpaid, the City refused. Order, R. at 1381–82.

On March 27, 1997, the City held an *in rem* auction "of City-owned real estate at which the Property was offered for sale." Stip. ¶ 42, R. at 472. A company called SBK Holdings emerged as the victor. Order, R. at 1351. But, upon learning that SBK Holdings was owned by the Schorr Brothers' children (together, the "Schorr Cousins"), the City cancelled the sale. Order, R. at 1382; Stip. ¶ 45, R. at 472. In 1997, SBK Holdings sued the City in state court, seeking to compel the specific performance of the sale. *In re SBK Holding v. City of New York*, Index No. 115704/97 (Sup. Ct. N.Y. Cnty. Mar. 19, 1998) (the "SBK Action"), R. at 169–78; Order, R. at 1382; Stip. ¶ 45, R. at 472. The City answered the complaint on September 17, 1997, and averred that the sale was improper, given the relationship between the owners of SBK Holdings and Cranston. Order, R. at 1382; City Answer to SBK Action ("City SBK Answer"), R. at 1089–1111. In the same response, the City acknowledged a "potential cloud" on its claim of "the title to the Property stemming from the City's in rem taking," specifically, that the City took title during—but allegedly without knowledge of—Cranston's bankruptcy, and that "an automatic stay would usually have prevent[ed] the taking." Order, R. at 1382; City SBK Answer, R. at 1109–10. In the SBK Action, the state court ultimately found for the City in March 1998. Order, R. at 1382. The SBK Action would be the last known action taken in state court by Cranston or its affiliates with respect to the Property. Order, R. at 1383. During the entire time of these state court actions, nothing in the record suggests that Cranston or any of its shareholders or affiliates made any attempt to return to the Bankruptcy Court for relief.

In 2004, the City demolished the Property. Order, R. at 1382. The following year, the City

sued Cranston for taxes on the Property. *City of New York v. J. J. Cranston Construction Corp.*, et al., Index No. 401768/05 (Sup. Ct. N.Y. Cnty. June 2, 2005) (the "Delinquent Taxes Action") R. at 55; Order, R. at 1382; Stip. ¶ 51, R. at 473.  At some point in prosecuting the Delinquent Taxes Action, the City realized that the deed conveying title to the Property had not been vacated. Order, R. at 1382; Stip. ¶ 52, R. at 473.  After an inexplicable decade-long delay, the City requested the judgment in the Foreclosure Action be vacated on the grounds that the judgment was obtained while the automatic stay in Cranston's bankruptcy was still in effect.  Order Vacating Judgment of Foreclosure, R. at 52; Stip. ¶ 52, R. at 473.  The vacatur was granted on October 13, 2017, and, on January 26, 2018, the order implementing it was recorded by the City, thus restoring title to Cranston.  Order, R. at 1382–83; Stip. ¶ 52–53, R. at 473.

Shortly after restoration of title to Cranston, Sault Schwartz—a real estate investor—learned of the vacatur and contacted various members of the Schorr family.  Order R. at 1383; Feb. 27, 2024, Trial Transcript ("Tr.") at 117:14–25, R. at 1037.  Soon, Schwartz and the Schorrs were in business; Cranston conveyed the Property's title to 1650 Madison LLC, the sole members of which were Cranston and—through his company Rounded Equities LLC—Schwartz.  Order at R. at 1383; Operating Agreement, R. at 306; Tenants in Common Agreement, R. at 1254.  In June 2020, the LLC sold the property for $4,000,000, of which Cranston received $1,350,000.  Stip. at ¶¶ 60–61, R. at 474.  Of that sum, Cranston distributed $1,337,500 to various members of the Schorr family.  Order, R. at 1383; Stip. ¶ 62, R. at 474; Cranston Rog. Responses, R. at 296–97. A return to the Bankruptcy Court would soon follow.

## Procedural History

In December 2022, about three decades after its closure, Cranston moved to reopen its bankruptcy case, undo its conversion to a Chapter 7 liquidation, and restore it to its original form

4

as a Chapter 11 reorganization case.[2]  Order, R. at 1383; Bk.-Dkt. 49 and 50, R. at 5–20.  As part of its resuscitation strategy, Cranston sought to have the City held in contempt under 11 U.S.C. § 105, arguing that the City violated the automatic stay by securing the *in rem* judgment of foreclosure and alleging damages amounting to $11,050,000, plus interest.  Cranston's Motion to Reopen and Reconvert ("Mtn. to Reopen"), Bk.-Dkt. 50, ¶ 52, R. at 80; ¶ 47, R. at 79.  The parties engaged in additional discovery and proceeded to an evidentiary hearing on the motion to reopen (the "trial").  Order, R. at 1384.[3]

The hearing put finality in the grasp of the parties for a litigation odyssey that has lasted more than thirty years.  Cranston called only two witnesses at trial: Peter Schorr and Saul Schwartz.  Tr. at 5, R. at 1009.  Peter Schorr was the son of Harold Schorr (one of the original Cranston shareholders) and a principal of East Harlem Management, a subtenant of the Property.  Tr. 24:20–25:8, R. at 1014; Stip. ¶ 26, R. at 470.  He became a shareholder in Cranston following his father's death.  Tr. 25:5–8, R. at 1014.  At trial, Peter Schorr testified that he did not know of any books and records or witnesses that could provide insight into Cranston's finances, assets, or liabilities.  Order, R. at 1387; Tr. at 43:1–4, R. at 1019.  He further testified that he could not remember whether East Harlem or others paid rent to Cranston, Tr. at 31:15–25, R. at 1016, or if there was a

---

[2] This was not Cranston's lone gambit.  Apparently, Cranston's overall strategy was to toss a plate of legal linguine at the wall to see what strands would stick.  One of those strands was to file suit, *de novo*, in this Court in October 2020.  *J.J. Cranston Constr. Corp. v. City of New York*, 20-CV-04902 (E.D.N.Y. 2020) (Gujarati, J.); Order, R. at 1383.  The case was dismissed after the Court found that the Bankruptcy Court was the appropriate venue for relief.  *Id.*

[3] After trial, Cranston moved the Bankruptcy Court to submit additional evidence, which the Bankruptcy Court denied.  Order, R. at 1353; Bk.-Dkt. at 84, 99.  The evidence Cranston sought to submit to the Bankruptcy Court post-trial is strikingly similar to its *in limine* request for this Court to take judicial notice of certain facts, which the Court denies.  *See* Dkt. 8 and April 22, 2025, Text Order.  *See also In re Taneja*, No. 17 CIV. 5618 (ER), 2018 WL 1831853, at *2 (S.D.N.Y. Apr. 16, 2018) (in reviewing a bankruptcy court's decision, "the district court may not consider evidence outside the record.").

lease or sublease between East Harlem and Cranston. Order, R. at 1387; Tr. 33:5–22, R. at 1016. Likewise, he did not know if any books, records, or witnesses were available to speak to the same. Order, R. at 1388; Tr. 31:15–25, R. at 1016.

Though he was not personally involved in the affairs of the Property, Schwartz took the stand in the Bankruptcy Court and testified. Order, R. at 1388; Tr. 57:6–24, R. at 1022; Tr. 96:6–15, R. at 1032. Schwartz gave testimony based on two appraisals: (1) an appraisal based on the physical condition of the Property pre-demolition and (2) an appraisal based on a ground lease between 1997 and 2004.[4] Under the first appraisal, Schwartz testified that Cranston was entitled to $3,000,000 in damages (the difference between the pre- and post-demolition property value). Order, R. at 1389. Schwartz testified that the ground lease approach would put the damages at $7,500,000. Order, R. at 1389. Like Peter Schorr, Schwartz testified that Cranston had no surviving books or records relating to rent collection. Tr. 100:5–101:6, R. at 1033.

As reflected by the copious number of stipulated facts referenced in this decision, there is no dispute about an essential fact that lights through the shroud of contentious litigation which has bedeviled Cranston and the City for decades. It is simply this: the City no longer disputes, and the parties agree, that the City's acquisition of title to the Property by *in rem* foreclosure violated the bankruptcy's automatic stay, which would entitle the debtor to damages in the ordinary course. Order, R. at 1395; Tr. at 83:23–84:8, R. at 1029. All that would be left for resolution in such cases

---

[4] When Cranston sought to introduce the appraisals and related experts at trial, the City filed a motion *in limine* seeking its exclusion. City's Motion in Limine, Bk.-Dkt. 77, R. at 279. After conferring pre-trial, Cranston agreed to withdraw the exhibits and the experts. Bk.-Dkt. 80, R. at 481–82. At trial, the Bankruptcy Court offered Cranston the opportunity to adjourn, if Cranston wanted to include its appraisal evidence and fight the City's motion *in limine*. Tr. at 21:17–20, R. at 1013. After discussing with his client, Cranston's counsel declined. Tr. 21:10–22:25, R. at 1014. Though included in the record as attachments to Cranston's post-trial briefing, *see* R. at 489, neither appraisal was admitted into evidence.

would be a trial as to damages. Order, R. at 1386–87. As this procedural history makes clear, however, nothing about this litigation has been in the ordinary course. The current controversy is nestled in a bankruptcy case that was closed in 1994, more than thirty years ago. Especially in this context, the elemental and first question was not whether Cranston could prove damages in a case where all agreed that liability was against the City, but whether the closed bankruptcy case should be reopened at all. That is precisely the question to which the Bankruptcy Court turned its attention. Order, R. at 1385–87. In considering whether to grant Cranston's motion to reopen and then convert the case to a reorganization under Chapter 11, as opposed to a liquidation under Chapter 7, the Bankruptcy Court found that Cranston failed to carry its burden. Order, R. at 1370–72. First, the Bankruptcy Court found reopening would not benefit creditors because Cranston would be unlikely to prove its damages, due to the lack of books and records or witnesses with first-hand knowledge of the Property's condition, its net operating income, or Cranston's business operations. Order, R. at 1387–91. The Bankruptcy Court explained that appraisals lacking data regarding building condition or net operating income were "highly unlikely to be persuasive [a]nd that's being most generous." Order, R. at 1389. Second, the Bankruptcy Court considered the length of time since the case's closure. Order, R. at 1391–92. In doing so, it found that Cranston knew, or should have known, that the City took control of the Property well before 2018, the year Cranston purported to learn about the stay violation.[5] Order, R. at 1393–94. Because Cranston

---

[5] The Bankruptcy Court laid out three separate bases for Cranston's prior knowledge of the *in rem* taking during the automatic stay: "[t]hat the City took the property in violation of the stay would have been known to anyone that examined the land records and the bankruptcy court docket. Additionally, the debtor knew or should have known the City was taking control of the property when the City sent the building [tax notices] and later demolished the building. Further, SBK knew the City admitted that it violated the automatic stay prior to 1998 because in the City's answer to SBK's complaint [in state court], the City admitted it took the property in rem or the property was protected by the debtor's automatic stay and argued that was one reason why the sale to SBK must be canceled." Order, R. at 1393–94.

inexcusably slept on its right to pursue the City's alleged stay violation, the Bankruptcy Court reasoned, the doctrine of laches now precluded Cranston's claim. Order, R. at 1394. The Bankruptcy Court also explained that the delay in bringing the claim prejudiced the City, because the lack of evidence due to the passage of time would make it harder for the City to refute Cranston's claims at a damages trial. Order, R. at 1395.

On August 12, 2024, Cranston filed its appeal to this Court from the Bankruptcy Court's Order denying its motion to reopen its bankruptcy case and convert the case to a reorganization under Chapter 11. *See* Notice of Appeal, Dkt. 1., at 73.

## Legal Standard

"[U]nder 28 U.S.C. § 158(a)(1), a district court has jurisdiction to hear appeals only from 'final judgments, orders, and decrees . . . and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges.'" *Long Island Pine Barrens Soc., Inc. v. Sandy Hills, LLC*, No. 14-CV-4678 JS, 2015 WL 1275790, at *1 (E.D.N.Y. Mar. 18, 2015) (quoting 28 U.S.C. § 158). As with any appellate court, of course, there are restrictions on the mode and method of a district court's review of a determination made by the bankruptcy court.

Of key relevance here, the question of "whether to reopen a bankruptcy case is committed to the sound discretion of the bankruptcy court[,] not the District Court." *Bizzell v. Kurtzman Carson Consultants LLC (In re 21st Century Oncology Holdings, Inc.)*, No. 21-cv-5894 (NSR), 2024 U.S. Dist. LEXIS 56713, at *2 (S.D.N.Y. Mar. 22, 2024) (internal quotation marks omitted) (quoting *In re I. Appel Corp.*, 300 B.R. 564, 567 (S.D.N.Y 2003)). "A bankruptcy judge's decision to grant or deny a motion to reopen . . . shall not be disturbed absent an abuse of discretion." *In re Smith*, 645 F.3d 186, 189 (2d Cir. 2011). Abuse of discretion is used because the Bankruptcy Court's grant or denial of a motion to reopen "invoke[s] the exercise of a bankruptcy court's

8

equitable powers, which is dependent upon the facts and circumstances of each case." *In re Chalasani*, 92 F.3d 1300 (2d Cir. 1996).

Case law does provide guardrails to aid the district court in reviewing whether a bankruptcy court has abused its discretion in making a case reopening determination. To start, "[a] bankruptcy court abuses its discretion when its decision (1) rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) cannot be located within the range of permissible decisions, even if it is not necessarily the product of a legal error or a clearly erroneous factual finding." *Greenwald v. Pocmont Props., LLC*, No. 23-CV-02875 (RPK), 2024 U.S. Dist. LEXIS 107401, at *11–12 (E.D.N.Y. June 17, 2024) (internal quotation marks omitted) (quoting *In re Fletcher Int'l, Ltd.*, 536 B.R. 551, 558 (S.D.N.Y. 2015)). And while legal questions are reviewed *de novo*, "the bankruptcy court's application of those principles . . . is reviewed for abuse of discretion." *Id.* quoting *In re Refco Inc.*, 505 F.3d 109, 116 (2d Cir. 2007).

"The district court need not limit its review to the arguments raised or relied upon in the decision below but may affirm on any ground that finds support in the record." *Barry v. Perkins*, No. 20-CV-05050 (LDH), 2022 WL 992530 at *3 (E.D.N.Y. Mar. 31, 2022) (*quoting Fetman v. Musso*, No. 20-CV-1101 (MKB), 2021 WL 736415, at *4 (E.D.N.Y. Feb. 25, 2021)). However, the Court may not consider evidence outside of the record. *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 339 (S.D.N.Y. 2008). Arguments not raised in the bankruptcy court are considered waived and new arguments will not be considered on appeal, unless the party's waiver results in manifest injustice. *Worksman v. Century Sports, Inc.*, No. 16-CV-2447 (JMA), 2018 WL 11451335, at *2 (E.D.N.Y. Aug. 27, 2018). Put differently, "appellants cannot change their strategy on appeal." *In re Lynch*, No. 19-CV-3837(GRB), 2022 WL 1606000, at *4 (E.D.N.Y. May 20, 2022) (cleaned up).

9

Discussion

Under Section 350(b) of the Bankruptcy Code (the "Code"), "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b); *see also* Fed. R. Bankr. P. 5010. Because the Code does not define "cause," *In re Chalasani*, 92 F.3d at 1307, bankruptcy courts "may consider numerous factors including equitable concerns, and ought to emphasize substance over technical considerations" in deciding whether cause exists to reopen a case. *In re Easley-Brooks*, 487 B.R. 400, 406–7 (Bankr. S.D.N.Y. 2013) (quoting (*In re Emmerling*, 223 B.R. 860, 864 (2d Cir. BAP 1997)). These factors include, but are not limited to: "(1) the length of time that the case was closed, (2) whether a nonbankruptcy forum has jurisdiction to determine the issue which is the basis for reopening the case, (3) whether prior litigation in the bankruptcy court determined that a state court would be the appropriate forum, (4) whether any parties would suffer prejudice should the court grant or deny the motion to reopen, (5) the extent of the benefit to the debtor by reopening, and (6) whether it is clear at the outset that no relief would be forthcoming to the debtor by granting the motion to reopen." *In re Easley-Brooks*, 487 B.R. at 407. The bankruptcy court may also consider "the benefit to creditors, the benefit to the debtor, the prejudice to the affected party, and other equitable factors." *In re Narcisse*, No. 96-21345 NHL, 2013 WL 1316706, at *6 (Bankr. E.D.N.Y. Mar. 29, 2013) (citing *In re Stein*, 394 B.R. 13, (Bankr. E.D.N.Y. 2008)); *see also In re Dicks*, 579 B.R. 704 (Bankr. E.D.N.Y. 2017). The debtor's good faith, or lack thereof, is also a "significant factor." *In re Narcisse*, 2013 WL 1316706 at *6 (citing *In re Arana*, 456 B.R. 161, 172 (Bankr. E.D.N.Y. 2011) and *In re Koch*, 229 B.R. 78, 87–88 (Bankr. E.D.N.Y. 1999)). While it is the movant's burden to establish cause to reopen, *In re Arana*, 456 B.R. at 172, the question of reopening a case is ultimately "committed to the sound discretion of the bankruptcy court."

*Bizzell*, 2024 U.S. Dist. LEXIS 56713 at *2 (quoting *In re I. Appel Corp.*, 300 B.R. at 567).

In exercising this discretion, the Bankruptcy Court considered only two factors: (1) the benefit to creditors and (2) the length of time since the case had closed.  The Court can find no abuse of discretion in the Bankruptcy Court's choice or application of these factors.  The Bankruptcy Court began its analysis by finding that the objective of reopening was "to administer an asset," namely "the debtor's claim that the automatic stay was violated."  Order, R. at 1385. That being the case, the Bankruptcy Court explained that "the most important consideration is the potential benefit to creditors."  Order, R. at 1385–86.  Because all to agree that the City violated the automatic stay through its taking, the only remaining question regarding the purposefulness of reopening the case was whether Cranston could prove its damages upon reopening.  The Bankruptcy Court held Cranston's success would be unlikely.  Order, R. at 1387.  In failing to demonstrate that it could prove damages, the Bankruptcy Court reasoned, Cranston also failed to show that reopening the case would be a benefit to creditors or any other party.

With its frontal assault on the Bankruptcy Court's refusal to reopen meeting stiff resistance, Cranston tries a flanking maneuver; more accurately, a flip-flop maneuver.  It had been the avowed objective of Cranston and its cohort to justify reopening of the bankruptcy case by showing a benefit to creditors.  Confronting the same sort of evidentiary hearing shortfall that had hobbled its efforts to prove or even sketch out a realistic path to showing damages incurred by Cranston as a result of the City's violation of the automatic stay, Cranston similarly came up short in its effort to show that the reopening of its bankruptcy case would benefit Cranston's creditors.  Recognizing the import of that failure at trial, Cranston called two witnesses, Peter Schorr and Saul Schwartz, neither of whom—as noted earlier—had first-hand knowledge of the Property's condition or Cranston's business.  Tr. 26:4–20, R. at 1015; Tr. 30:8–17, 33:12–22, R. at 1016; Tr. 57:6–24, R.

11

at 1022; Tr. 96:6–15, R. at 1032.  Both witnesses testified that there are likely no surviving books and records or living witnesses with first-hand knowledge of the same.  Tr. 31:15–25, R. at 1016; Tr. 43:1–4, R. at 1019; Tr. at 43:1–4, R. at 1019; Tr. 100:5–101:6, R. at 1033.  Further, it was established in the record that all papers from the original bankruptcy case were destroyed in 2013.  Order, R. at 1381; Stip. ¶ 40, R. at 471.  Not surprisingly, the Bankruptcy Court concluded these appraisals, if admissible at all, would have little credibility.  Order, R. at 1389.  Additionally, the Chapter 7 trustee's decision to file a no asset report, along with Cranston's history of failing to pay its taxes or its mortgage, gives rise to the *opposite* inference: that the Property was not valuable.  Order, R. at 1390.  Plainly, nothing presented to the Bankruptcy Court could support Cranston's valuation of the Property.  Therefore, the Court can find no clear error in the Bankruptcy Court's factual findings.  And, because the Bankruptcy Court applied the correct legal standard to the facts, this Court can find no abuse of discretion in its finding that Cranston failed to demonstrate damages.

But Cranston pivots, arguing for the first time on appeal that it was error for the Bankruptcy Court to consider creditor benefit because any stay-related damages belong to Cranston alone, not the bankruptcy estate, and therefore would not be subject to distribution to creditors.  In doing so, Cranston appears to abandon its earlier argument that the damages from the stay violation could be distributed to creditors, benefitting them and, thus, justifying reopening.  *Compare* Br., Dkt. 7, at 18–19 *with* Cranston Reply ISO Reopening Brief ¶¶ 49–50, at R. at 215–16 ("Cranston has no issue sharing litigation proceeds with creditors. […] It is axiomatic that funds recovered by a corporate debtor in possession benefits its creditors.").

The flip-flop in position is itself fatal to the debtor-appellant's argument.  Dispositively, because Cranston's argument was not raised in the Bankruptcy Court, it is waived.  *In re Lynch*,

2022 WL 1606000 at *4. Yet, even if preserved below and properly raised on appeal here, Cranston's contention that stay damages are the sole property of the debtor—out of the reach of the bankruptcy estate and its creditors—is wrong as a matter of law. Indeed, much of the authority cited by Cranston cuts directly against its argument. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533 (5th Cir. 2009) (holding that principals in their capacity as *creditors*, not officers, had standing to pursue stay violations); *In re Crouser*, 476 B.R. 340, 342 (Bankr. S.D. Ga. 2012), *subsequently aff'd*, 567 F. App'x 902 (11th Cir. 2014) ("Since a stay violation, by its very nature, is not available at the commencement of the bankruptcy case, Debtor argues it cannot be property of the bankruptcy estate. I disagree and find such interpretation ignores the purpose of § 1306(a)(1) with respect to chapter 13 cases."). In any event, the Court can find no abuse of discretion either in the Bankruptcy Court's reliance on, or prioritization of, the creditor benefit factor. Likewise, the Bankruptcy Court did not abuse its discretion in holding that Cranston, by virtue of failing to prove damages, failed to meet its burden. Overall, Cranston failed to show the economic benefit to creditors it claimed it would show, nor did it show that there was a realistic evidentiary path to making such a showing. It also failed to meet its burden to show that creditor benefit was a factor that favored reopening of the closed bankruptcy case.

Still, as made plain in the Order below, even had Cranston made a plausible showing of damages flowing from the City's violation of the automatic stay or illuminated a plausible path for doing so, it would not have ensured the reopening of the closed bankruptcy case docket. One of the factors to be considered by a bankruptcy court in deciding whether to reopen a closed bankruptcy case—here, the second factor considered on Cranston's motion to reopen—is the length of time the case had been closed. This factor finds form in the equitable doctrine of laches, which prevents recovery where the party "has inexcusably slept on [its] rights" in bringing their

13

claim. *Merrill Lynch Inv. Managers v. Optibase*, Ltd., 337 F.3d 125, 132 (2d Cir. 2003) (quoting *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 65 (2d Cir.1983)).  While Section 350(b) of the Code does not limit time to reopen a case, "the doctrine of laches may be grounds for denying a motion to reopen" and bar relief where "a party unreasonably delays taking an action and the affected party is prejudiced by the delay." *In re Arana*, 456 B.R. at 174; *but see In re Emmerling*, 223 B.R. at 865 (stating that "in the absence of some *meaningful* prejudice, a court of equity would abuse its discretion by barring the reopening of a case") (emphasis added).  As the years since closure increase, so too does the weight of cause the movant must show.  *In re Arana*, 456 B.R. at 174 (citing *In re Lowery*, 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008)).  In other words, the older the case, the heavier the burden.  And while the "mere lapse of time does not constitute prejudice," a court exercising its equitable powers "must consider whether reopening a case would prejudice the adversary's position." *In re Arana*, 456 B.R. at 174 (quoting *Stein*, 394 B.R. at 16).

  Here, the lapse of time is anything but "mere," just as the proposition that Cranston first learned of the stay violation in 2018 is anything but credible.  From the time the bankruptcy closed to the time Cranston brought its initial suit in this Court, nearly thirty years have passed.  As such, Cranston's burden was significant.  But even if Cranston met this enhanced burden, which it has not, its delay in seeking relief for the stay violation was unreasonable.  The initial inquiry for the Court, then, is when Cranston had "actual notice of the claim or would have reasonably been expected to inquire about the subject matter." *In re Stein*, 394 B.R. at 17–18 (quoting *Advanced Cardiovascular Sys. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1163 (Fed. Cir. 1993)).

  There is ample support in the record for the Bankruptcy Court's conclusion that Cranston

14

slept on its rights.[6]  Seymour Schorr's request that the City release *in rem* title to the Property, dated January 12, 1995, is the earliest, clearest instance of Cranston's notice.  Stip. at ¶ 41, R. at 472.[7]  In his application to the City, Seymour Schorr acknowledged two key facts: (1) that the City acquired the Property through an *in rem* foreclosure action on February 3, 1993 and (2) that Cranston's bankruptcy case had closed in July 1994.  Seymour Schorr Application, R. at 310.  Taken together, the Court can infer that Cranston—through Seymour Schorr—knew that the City took *in rem* title during the bankruptcy, and therefore during the automatic stay.  By 1995, Cranston should have at least investigated how the City took title to the Property while it was protected under the bankruptcy's stay.  It did not.  A nearly thirty-year delay in prosecuting a stay violation a debtor should have known about is flatly unreasonable.

And quite significantly, Cranston's delay meaningfully prejudiced the City.  In 2013, the National Archives destroyed all records associated with Cranston's bankruptcy.  Stip. ¶ 40, R. at 471.  Moreover, as discussed *supra*, no books or records exist, and no witnesses are available to testify.  Had Cranston timely sought to reopen the bankruptcy proceedings, the City would have had the benefit of defending Cranston's contempt allegations with a full record.  Instead,

---

[6] The catalog of events providing reasonable notice of the City's *in rem* taking to Cranston and its officers and shareholders is long and varied.  First, Cranston would have had legal notice of the City's taking through the 1993 foreclosure judgment.  Second, Cranston knew the City took title when Seymour Schorr petitioned the City to release *in rem* title to the Property on January 12, 1995.  Stip. at ¶ 41, *see supra*.  Third, Cranston had notice that the City continued to hold title when it noticed the Property for auction on March 27, 1997.  Stip. ¶ 42, 43, 45, R. at 472.  Fourth, in its September 17, 1997 answer to SBK's lawsuit to compel the sale of the Property, the City acknowledged that its title to the Property had a potential cloud.  Stip. ¶ 48, R. at 472; City's Answer to SBK Action, R. at 1109–11.  Considering that SBK was formed by the Schorr Cousins—the Schorr Brothers' children—it is highly likely that Cranston knew of the City's acknowledgement.  Order, R. at 1394.  Fifth, Cranston had notice after the City sued it for back taxes in 2005 following the 2004 demolition of the Property.  Order, R. at 1382.

[7] In his testimony at trial, Schwartz agreed that, by 1995, Cranston was aware that the City had taken the property *in rem*.  Tr. 109:19–21, R. at 1035.

Cranston's delay left the parties and the courts with only the ability to divine evidence and speculate damages. Because Cranston's nearly thirty-year delay meaningfully prejudiced the City in its ability to dispute damages, there was certainly no abuse of discretion from the Bankruptcy Court. The equitable doctrine of laches barred Cranston's request to reopen its bankruptcy case.

In a last gasp plea, Cranston makes its final argument: that the City had unclean hands and, as such, should not benefit from a bar of laches. Similarly, the argument is without merit. In its answer to the SBK action, the City openly acknowledged that there was a potential cloud in its *in rem* title to the Property. Stip. ¶ 48, R. at 472; City's Answer to SBK Action, R. at 1109–11. To be sure, the City is not blameless. The reason for its delay between the time it realized a potential cloud in the title in 1997 and when it moved to vacate the foreclosure judgment in 2017 is entirely unclear from the record. Its delay, however, does not evidence bad faith. This is especially true where, as here, Cranston was on notice of an issue with the title and could have taken action to seek relief. Bluntly, it was not the City's unclean hands but Cranston's unexplained and unwarranted delay in adjudicating whatever rights it had in the Property that supports the laches bar.

## Conclusion

For the reasons discussed above, the Order of the Bankruptcy Court is affirmed. The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated:   Brooklyn, New York
        April 22, 2025

/s/ *Eric N. Vitaliano*
ERIC N. VITALIANO
United States District Judge

16